ANGELA FIGUEROA, ET AL., demandantes y recurrentes, *v.* MUNICIPIO DE SAN JUAN (GOBIERNO DE LA CAPITAL DE PUERTO RICO), demandado y recurrido.

*Número:* R-67-157    *Resuelto:* 11 de febrero de 1970

*Inés Acevedo de Campos* y *Raúl Matos,* abogados de los recurrentes; *Rodolfo F. Aponte,* (*) abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

—I—

*La Base del Pleito*

(1) Por escritura Núm. 4 otorgada en Ponce el 9 de enero de 1922 ante el Notario M. Alberto Salicrup, comparecieron Don Enrique Adsuar y Boneta por sí y como apoderado de su esposa Doña Rosario Miró; Don Luis de la Cruz y Santiago como apoderado de su hermana Doña Rita de la Cruz y Santiago; Don Casimiro Figueroa y Reyes; Don Sandalio Torres Monge como apoderado de su esposa Doña Ángela Figueroa y Reyes; Don José Víctor Figueroa y Reyes; Don Juan Figueroa y Reyes; Don Ángel Figueroa Reyes casado con Doña María Siuró y Renta, y procedieron a la división entre ellos de la finca conocida con el nombre

(*) Renunció a dicha representación legal el 30 de diciembre de 1968, luego de haber sometido el caso en su fondo el 29 de septiembre de 1967.

de "El Reloj", ubicada en el Barrio de Santurce y que perteneció a los esposos Don Ramón Figueroa y Doña Carmen Reyes Arroyo, según consta en la testamentaría de éstos, inscrita con el número 1824 al folio 82 vuelto del Tomo 64 de San Juan, inscripción 13a.

(2) Se describió la finca con una superficie total de 96 cuerdas, 2,732 varas cuadradas, con sus respectivas colindancias por sus puntos cardinales.

(3) En virtud de la testamentaría mencionada y de ciertas adquisiciones hechas de otros herederos, los comparecientes vinieron a ser dueños de dicha finca, en determinadas participaciones que no es necesario ahora detallar.

(4) En la escritura Núm. 4 mencionada manifestaron los comparecientes que al hacer la división material habían determinado, "para el mejoramiento de la finca en beneficio de todos", diversas calles y una plaza de recreo que fueron descritas en su extensión y trayectorias. A los efectos de este pleito deben mencionarse las siguientes:

(a) La Calle "Del Rosario" con una trayectoria de Este a Oeste atravesando las Calles "José Ramón Figueroa", "Labra" y del "Condado", con un ancho de 12 metros y un área superficial de 3661.80 metros cuadrados;

(b) La Calle "Corchado" con trayectoria de Este a Oeste atravesando las Calles "José Ramón Figueroa", "Labra" y "Condado", con un ancho de 12 metros y un área superficial de 331.20 metros cuadrados.

(c) La Calle "Labra", en dirección de Norte a Sur, y la Calle "José Ramón Figueroa", con igual trayectoria de Norte a Sur, partiendo ambas de la Avenida Ponce de León.

(5) La porción de terreno dedicada a "Plaza de Recreo" quedó situada entre las Calles del Rosario con la que colinda por el Norte, la Calle "Labra" por su Oeste, la Calle "Corchado" por el Sur y por el Este en colindancia con terrenos adjudicados en la misma escritura de partición a Doña Rita

de la Cruz. Se hizo constar que tenía un área superficial de 4,5000 metros, con una extensión por el Norte a lo largo de la Calle "Del Rosario" de 60 metros 4 centímetros; por el Sur, a lo largo de la Calle "Corchado", 52 metros 6 centímetros; por el Oeste, a lo largo de la Calle "Labra", de 76 metros 33 centímetros y por el Este en su colindancia con Rita de la Cruz, de 74 metros 8 centímetros.

(6) En lo que a este pleito respecta, y en pago de sus respectivas participaciones, se adjudicó a Doña Rita de la Cruz Santiago una porción con un área superficial de 8,542.86 metros cuadrados, colindando por el Norte en una distancia de 114 metros 75 centímetros con la ahora Avenida Fernández Juncos; por el Oeste en 78 metros 22 centímetros con la Calle "Labra"; por el Sur en 106 metros 43 centímetros con la Calle "Del Rosario" y por el Este en 76 metros 20 centímetros con la Calle "José Ramón Figueroa".

(7) En lo que respecta también a este pleito, se le adjudicó a la misma señora Rita de la Cruz Santiago otra parcela con un área superficial de 3,200.72 metros cuadrados en lindes por el Norte con la Calle "Del Rosario" en una distancia de 46 metros 16 centímetros; por el Oeste en lindes con la "Plaza de Recreo" descrita en el párrafo (5) anterior en una distancia de 74 metros 8 centímetros; por el Sur con la Calle "Corchado" en una distancia de 44 metros 16 centímetros y por el Este con la Calle "José Ramón Figueroa" en una distancia de 72 metros 38 centímetros. *VÉASE LA GRÁFICA:*

AVENIDA FERNANDEZ JUNCOS

PARCELA

**A**

8,542.86 m/c
Adjudicada a Rita Santiago. Escritura
Núm. 4 de 1922.

CALLE LABRA

CALLE FIGUEROA

CALLE ROSARIO

PARCELA

**B**

3,200.72 m/c
Adjudicada a
Rita Santiago.
Escritura Núm.
4 de 1922.

PLAZA
DE
RECREO
4,500 m/c
Escritura Núm. 4
de 1922.

CALLE CORCHADO

(***) Agrupación, segregación,
venta. Escrituras 6 y 12,
1928 y 1929.

—II—

## La Cuestión Litigiosa

(8) El 11 de diciembre de 1962 los recurrentes por sí y en representación de los herederos, causahabientes y cesionarios de las personas que en 9 de enero de 1922 eran dueños de la finca "El Reloj" y se la repartieron según la escritura Núm. 4 relacionada en el párrafo (1) anterior, interpusieron demanda contra el Gobierno de la Capital de conformidad

con la Regla 20.1 de Procedimiento Civil. (¹) Unieron como Anexo A a dicha demanda una relación que contiene los nombres de las personas herederas, causahabientes o cesionarias de los dueños de la referida finca según la escritura Núm. 4, 71 personas en total, y se hizo constar que la recurrente Angela Figueroa Reyes era la única condueña viva de la propiedad.

(9) Se alegó en la demanda que los recurrentes, como herederos, causahabientes y cesionarios de los dueños originales de la finca, párrafos (1) y (3), eran dueños en común pro indiviso de las parcelas descritas en la escritura de partición como "Calle del Rosario" y "Plaza de Recreo"; que bajo el pretexto de haber adquirido dichas parcelas por cesión según la referida escritura Núm. 4 de 9 de enero de 1922 el Gobierno de la Capital había expedido la Certificación Núm. 465 de 7 de abril de 1958 para obtener que se inscribieran ilegalmente a su favor (a) parte de la Calle "Del Rosario" con una cabida de 1212.9462 metros cuadrados, que quedó inscrita al folio 103 del tomo 151 de Santurce Sur, finca 4885, inscripción 1ra.; y (b) parte de la parcela descrita como "Plaza de Recreo" con una cabida de 3735.7278 metros cuadrados, que quedó inscrita al folio 102 del tomo 151 de Santurce Sur, finca Núm. 4884, inscripción 1ra.; todo ello sin consentimiento ni intervención de los legítimos dueños.

---

(¹) Comparecieron como demandantes Ángela Figueroa Reyes, Alejandro y Carmen Figueroa Maldonado, Carmen Figueroa Collazo, Carlos A. Figueroa Camacho, Roberto y Manuel Figueroa García, Ernesto y Emigdio Figueroa Ortiz, Rafael y José Ángel Figueroa Ciuro, todos *por sí* y en representación y para beneficio de Rosario Miró Vda. de Adsuar, y de todos los miembros y cesionarios de las Sucesiones de José Víctor Figueroa Reyes, Juan Figueroa Reyes, Casimiro Figueroa Reyes, Ángel Figueroa Reyes, Enrique Adsuar, Luis de la Cruz y su esposa Rosa Figueroa Reyes, Lydia Figueroa Ortiz, Juan Figueroa Rivera. Alegaron los demandantes que su presencia en el pleito asegura una adecuada representación de todas las personas mencionadas en el Anexo A, y se solicita un remedio común para todos. Ver Regla de Procedimiento Civil 20.1.

(10) Se alegó que ilegalmente y por la escritura Núm. 17 otorgada en San Juan el 4 de junio de 1958 ante la Notario Margarita Landrau, el Gobierno de la Capital agrupó las referidas dos parcelas con otras más para formar otra finca con una cabida superficial de 12,019.4567 metros cuadrados, en lindes por el Norte con terrenos de Texaco Service Station, Blanco Auto Service y J.J. Gerardino; por el Sur con la Calle "Corchado"; por el Este con la Calle "Figueroa" y por el Oeste con la Calle "Labra", finca esta que quedó inscrita al folio 134 del tomo 151 de Santurce Sur con el número 4891. Alegaron que dicha inscripción y sus agrupaciones son nulas por carecer el Municipio de San Juan de título alguno sobre dichas parcelas.

(11) Por una segunda causa de acción alegaron los recurrentes que por las Ordenanzas Núms. 84 de 1956–57 y 33 de 1957–58 relativas a la "Plaza de Recreo" y a parte de la Calle "Del Rosario", el Municipio de San Juan entró ilegalmente en la posesión de las referidas parcelas, de mala fe y sin justo título sobre ellas, y ha derivado frutos civiles.

(12) Por una tercera causa de acción alegaron los recurrentes que el Gobierno de la Capital ha pretendido vender la finca agrupada de 12,019.4567 metros cuadrados, y que para facilitar dicho traspaso obtuvo la aprobación de la Ley Núm. 9 de 15 de mayo de 1962 dispensándole del requisito de subasta; y que el Municipio carece de poder para vender, con o sin subasta, la referida finca.

(13) Solicitaron los recurrentes la nulidad y cancelación en el Registro de las inscripciones a favor del Gobierno de la Capital relativas a dichas parcelas "Plaza de Recreo" y Calle "Del Rosario"; la nulidad de la escritura de agrupación Núm. 17 de 14 de junio de 1958 ya referida, así como la nulidad de la Certificación del Municipio de San Juan Núm. 465 de 7 de abril de 1958; que el tribunal ordenara al Municipio de San Juan la entrega a los recurrentes y personas representadas por ellos de las referidas dos parcelas

con la devolución de frutos derivados desde 1956 a 1957 e intereses, y que se prohibiera al Municipio la enajenación de dichas fincas. Solicitaron además los recurrentes que por tratarse de un "pleito de clase" el tribunal fijara los honorarios de sus abogados.

(14) La demanda fue negada y las partes suscribieron una estipulación en virtud de la cual sometieron la prueba documental que debía ser aceptada como evidencia de ambas partes o como evidencia de alguna de ellas. Entre esta evidencia aparecen ciertas constancias del Pleito Civil Núm. R-5777 seguido ante el entonces Tribunal de Distrito de San Juan por Ángela Figueroa Vda. de Torres Monge por sí y en representación de otros de su clase, contra el Gobierno de la Capital, sobre "Compensaciones y Daños".

(15) Estipularon las partes que las descripciones de la "Plaza de Recreo" y de la parte de la Calle "Del Rosario" en litigio eran las que resultan del hecho primero—letras "B" y "C" respectivamente—de la escritura Núm. 17 otorgada en 4 de junio de 1958 ante la Notario Margarita Landrau, excepto que los demandantes alegan que parte de los terrenos al sur de la Calle "Del Rosario" son de su propiedad y no del Gobierno de la Capital, por lo cual debían figurar ellos como colindantes por la parte Sur. (2) Igualmente estipularon que la cabida exacta de la parcela en litigio sería determinada mediante una mensura y *deslinde posterior* a sentencia en caso de que la sentencia que se dictare en el pleito fuera favorable a los demandantes-recurrentes.

(16) Estipularon además que una serie de actos oficiales e inscripciones que detallaron, incluyendo la agrupación hecha por la escritura Núm. 17 de 4 de junio de 1958 para

---

(2) En esta escritura se describió la "Plaza de Recreo" con una cabida de 3735.7278 metros cuadrados y la parte de la Calle "Del Rosario" con una cabida de 1212.9462 metros cuadrados. La parte de la Calle "Del Rosario" en litigio es la manzana comprendida entre las Calles "Labra" y "José Ramón Figueroa".

formar la finca 4891, que se refieren todos a ciertos predios de terrenos identificados y descritos de diversas formas y con distintas cabidas, comprenden entre ellos el pedazo de la Calle "Del Rosario" reclamado en la demanda, así como la "Plaza de Recreo".

(17) Finalmente estipularon que el pedazo de la Calle "Del Rosario" en litigio y la "Plaza de Recreo" estuvieron dedicados al mismo uso público a que estaban dedicados cuando se dictó la sentencia en el caso R-5777 en el año 1948, y hasta la fecha en que los mismos fueron retirados del uso público por el Municipio de San Juan en el año 1957.

(18) Con esta estipulación y la prueba documental ofrecida y con un breve testimonio oral del testigo Ernesto Figueroa respecto a que las personas mencionadas en el Anexo A de la demanda eran los sucesores, causahabientes o cesionarios de los dueños originales de la finca, quedó sometido el caso. De la prueba documental en el récord, surgen los siguientes hechos:

i. Por escritura Núm. 159 de 12 de diciembre de 1923, otorgada en Ponce ante el Notario Felipe Colón Díaz, los esposos Don Luis de la Cruz Santiago y Doña Rosa Figueroa Reyes adquirieron de Doña Rita de la Cruz Santiago las parcelas de 8,542.86 m/c y 3,200 m/c adjudicadas a ésta, descritas en los párrafos anteriores (6) y (7) marcadas en el *Plano* "A" y "B". Estas fincas quedaron inscritas a favor de los esposos De la Cruz-Figueroa Reyes en el Registro de la Propiedad.

ii. Por escritura Núm. 6 otorgada en San Juan el 16 de enero de 1928 ante el Notario José Martínez Dávila, los esposos Luis de la Cruz y Rosa Figueroa Reyes segregaron de la parcela "A" de 8,542.86 m/c una porción de 5,313.44 m/c en lindes al Norte, en 110.59 metros con la finca principal de donde se segrega; al Este, en 48.20 metros con la calle "José Ramón Figueroa"; Sur, en 46.16 metros primero con el propio Luis de la Cruz (Parcela "B") de

3,200.72 m/c y segundo, en 60.04 metros con el Municipio de San Juan (Plaza de Recreo).

iii. Por la misma escritura Núm. 6 los esposos De la Cruz-Figueroa manifestaron que la anterior parcela segregada colindaba con la otra "B" de su propiedad de 3,200.72 m/c y que formando ambas un solo cuerpo, procedieron a agruparlas en otra distinta que describieron como de 8,530 m/c [8,514.16 m/c] en lindes al Norte en 110.59 metros con la finca principal; al Sur, en dos alineaciones en forma de martillo de Este a Oeste, la primera de 44.16 metros en lindes con la Calle "Corchado" y la segunda de 60.04 metros en lindes con la "Plaza de Recreo"; al Este en 120.58 metros con la Calle "José Ramón Figueroa"; y al Oeste, en dos alineaciones en forma de martillo de Sur a Norte, la primera de 74.08 metros en lindes con la "Plaza de Recreo" y la segunda de 38.22 metros con la Calle "Labra".

iv. Así agrupadas en una sola finca, los esposos De la Cruz-Figueroa vendieron esta porción de 8,530 [8,514.16] metros cuadrados al Municipio de San Juan al precio unitario de $6.00 el metro cuadrado y un total de $51,180.

v. La anterior compra fue autorizada por Resolución Núm. 365 del Municipio de San Juan del año 1928, según enmendada por la Resolución Núm. 372 del mismo año. No obstante lo anterior, por Ordenanza posterior Núm. 72 de 27 de junio de 1929 se autorizó idéntica adquisición, y se otorgó de nuevo la escritura Núm. 12 de 15 de agosto de 1929 ante el Notario Edelmiro Martínez Rivera adquiriéndose la misma propiedad por el Municipio, sin que ni la Ordenanza Núm. 72 ni esta escritura hicieran relación o mención alguna a la Resolución Núm. 365 y a la escritura Núm. 6 anterior. En la parte expositiva de la Ordenanza Núm. 72 se expresa que el Sr. Luis de la Cruz donó al Municipio de San Juan y éste había aceptado la parcela de 4,500 m/c (Plaza de Recreo) colindante con esta propiedad. Nada hay en la prueba sometida que acredite que Don Luis de la Cruz

o su esposa Sra. Rita Santiago fueran dueños en algún momento antes de la parcela "Plaza de Recreo" supuestamente donada por él al Municipio.

vi. Surge en forma indubitada de la anterior escritura Núm. 6 ante el Notario Martínez Dávila, y luego de la Núm. 12 ante el Notario Edelmiro Martínez Rivera, que la segregación y agrupación ahí realizadas incluyeron la porción de la Calle "Del Rosario" entre "José Ramón Figueroa" y "Labra", no obstante haberse separado este predio para calle en la escritura Núm. 4 de 1922 de división material de la finca "El Reloj", y que dicha porción no fue allí adjudicada a ninguno de los copartícipes.

vii. La prueba en el récord no contiene las constancias del Registro a este respecto, ni contiene la cabida del remanente de la finca principal—Parcela "A" del *Plano*— de donde se hizo la segregación. En esas circunstancias no estamos en condiciones de determinar si al adquirir título sobre esta propiedad así agrupada el Municipio era o no un tercero según el Registro, y en ausencia de otra prueba, si era o no tercero civil de buena fe en lo que respecta al título sobre la porción que comprendía la Calle "Del Rosario" no adjudicada a la persona de quien el Municipio adquirió.

viii. Resulta un hecho, en lo que respecta a dicha porción de calle que es una de las dos propiedades aquí en litigio, que el título del Municipio aparentemente no parte de la separación de terreno para calles—Calle "Del Rosario" —en la escritura Núm. 4 de 9 de enero de 1922, sino de las escrituras Núms. 6 de 16 de enero de 1928 y 12, de 15 de agosto de 1929; con sujeción a las impugnaciones que pudieran haber contra dicho título de no haber sido el Municipio un tercero protegido.

ix. Por Ordenanza Núm. 85 de 5 de junio de 1957 se autorizó a la Administradora de la Capital a celebrar vistas públicas para retirar del uso público el tramo de la Calle "Del Rosario" entre "José Víctor Figueroa" y la Carretera

Estatal Núm. 2 (Labra). Se hace constar en la parte exposi-
tiva que dicho tramo siempre había estado agrupado a y
formaba parte de un solar del Municipio y que dicha Calle
*nunca había sido usada como vía pública.* Por la Ordenanza
Núm. 33 de 7 de agosto de 1957 se retiró del uso público el
referido tramo de la Calle "Del Rosario".

    x. En 18 de diciembre de 1957 la Junta de Planifica-
ción rindió el Informe Núm. 58-p-833 sobre agrupación de
terrenos del Gobierno de la Capital, que según quedó enmen-
dado por otro de 22 de enero de 1958 autorizó la agrupación
de la Parcela "B" del *Plano* anterior con el remanente de
la "A" después de segregaciones para Garage Texaco, Blanco
Auto Service y J. J. Gerardino; con la porción de la Calle
"Del Rosario" entre "Figueroa" y "Labra", y con la parcela
"Plaza de Recreo". Se describió la finca agrupada como par-
cela con una cabida de 12,019.4967 m/c en lindes por el
Norte, con terrenos de Texaco Service Station, Blanco Auto
Service y J. J. Gerardino; Sur, con la Calle "Corchado",
Este, Calle "Figueroa" y Oeste, Calle "Labra". Se hizo cons-
tar en el Informe que la Calle "Del Rosario" había sido
eliminada mediante Ordenanza Núm. 95 de 1955–1956. Se
hizo constar, además, que la *parte oeste* de la Parcela agru-
pada se *estaba utilizando para parque de recreo activo,* y
que la Junta no tenía objeción a que se retiraran del uso
público los terrenos dedicados a parque de recreo y fueran
dedicados a uso patrimonial siempre que se cumpliera con
los trámites requeridos para actos de esa naturaleza. De este
Informe y de su enmienda se tomó razón en el Registro de
la Propiedad en 25 de agosto de 1958.

    xi. Por Certificación Núm. 465 de 7 de abril de 1958,
y conforme a los Arts. 31 al 36 del Reglamento Hipotecario
según enmendados, el Gobierno de la Capital obtuvo la ins-
cripción a su favor de: (1) la parcela segregada según
escritura Núm. 6 de 16 de enero de 1928 ante Martínez
Dávila, con una cabida ahora de 3,775.2269 m/c; (2) la

parcela en litigio en todo momento descrita como "Plaza de Recreo", con una cabida ahora de 3,735.7278 m/c; y (3) la parcela parte de la calle "Del Rosario" en litigio, con una cabida de 1212.9462 m/c.

xii. En la Certificación se le hizo constar al Registrador que la porción (1) se había adquirido en la forma ya dicha, y que las porciones (2) y (3) Plaza y Calle, se habían adquirido por *cesión* de la Sucn. de Carmen Reyes al Municipio *mediante la escritura Núm. 4 de 9 de enero de 1922 ante el Notario Salicrup.* Se hizo constar al Registrador que la porción (2) (Plaza) fue destinada desde mucho tiempo al uso público como "Plaza de Recreo" y que por Ordenanza Núm. 84, 1956–57, dicha plaza de recreo se retiró del uso público a patrimonial; que la porción (3) (Calle) fue destinada desde muchos años al uso público trazándose la Calle "Del Rosario" y que por Ordenanza Núm. 33, 1957–58, fue retirada del uso público a patrimonial.

xiii. Hemos examinado la Ordenanza Núm. 84, 1956–57, ahí mencionada, y la propiedad en ella descrita a ser retirada del uso público y difícilmente puede conciliarse con la parcela desde el primer momento descrita como "Plaza de Recreo". Se hizo constar finalmente en esta Certificación que el Municipio de San Juan había estado en la posesión de las descritas tres parcelas por más de 30 años quieta, pública y pacíficamente, sin interrupción, y en concepto de dueño *"desde la fecha de sus adquisiciones."* Estas parcelas fueron inscritas separadamente a favor del Municipio en 15 de agosto de 1958, inscripciones primeras, no obstante que la porción (1) de 3,775.2269 m/c había sido, según el récord, objeto de agrupación con otra, formando un cuerpo distinto.

xiv. Por escritura Núm. 17 de 4 de junio de 1958 ante la Notario Margarita Landrau se procedió a la agrupación de las tres porciones descritas en los párrafos xi y xii anteriores y Certificación Núm. 465 de 7 de abril de 1958, más una cuarta parcela de 3295.5558 m/c (la parcela "B" del

anterior *Plano*, de 3200.72 m/c rectificada ahora su cabida) formando una finca distinta que quedó inscrita como finca Núm. 4891 en 25 de agosto de 1958, inscripción 1ra. Esta parcela agrupada se describió con cabida de 12,019.4567 m/c formando el polígono comprendido entre las Calles "Labra" por el Oeste, "Corchado" por el Sur y "Figueroa" por el Este, y en colindancia al Norte con Texaco, Blanco y Gerardino. Se ratificó en esta escritura la procedencia del título de las tres primeras parcelas según fue expresado en la Certificación 465, y se repitió que la Ordenanza Núm. 84 de 1956–57 había retirado la "Plaza de Recreo" del uso público. Repetimos que la descripción de la propiedad hecha en esta Ordenanza no responde a la descripción conocida de la "Plaza de Recreo". En lo que respecta a la cuarta parcela agrupada, que según el récord había sido adquirida por el Municipio por la escritura Núm. 6 de 16 de diciembre de 1928 agrupada a otra, se hace constar ahora que el Municipio la obtuvo por sentencia en el caso Civil Núm. 40,991 sobre Nulidad, etc., entre la Capital como demandante y Cipriano Manrique y otros como demandados, y que aparecía inscrita como finca Núm. 2554. (Esta finca había sido agrupada a otra en la escritura Núm. 6 aludida.)

xv. Por las R. C. Núms. 118 de 25 de junio de 1958 y 84 de 6 de junio de 1960, y escrituras Núms. 22 de 5 de septiembre de 1958 y 7 de 8 de agosto de 1960, ambas ante la Notario Margarita Landrau, respectivamente, el título de esta parcela de 12,019.4567 m/c pasó al Pueblo de Puerto Rico y de nuevo al Municipio de San Juan.

xvi. Por Ordenanza Núm. 46 de 15 de septiembre de 1960 se autorizó a la Administradora de la Capital a vender esta parcela de 12,019.4567 m/c por no tener utilidad pública para el Municipio.

xvii. En el Informe 61-C-114 de la Junta de Planificación de 16 de noviembre de 1960 se recomendó favorablemente la venta propuesta por la anterior Ordenanza. Se

expresa en el Informe que las oficinas ubicadas en parte de estos terrenos se habían traslado; y que el "área recreativa" había sido sustituida por otras ubicadas en sectores adyacentes; que estos terrenos serían permutados al Negociado de Correos Federal por otro solar, aunque el Correo había desistido de construir su oficina central en ese sitio. Se aprobó el proyecto considerando que el terreno (predio de 12,019.4567 m/c) no tenía uso para el Municipio y que con el producto de la venta podrían atenderse otros programas y siempre que la venta se ajustara a la zonificación vigente.

xviii. En igual fecha, 16 de noviembre de 1960, la Junta de Planificación rindió el Informe 61-P-1007, en que reiterando que ya esta propiedad no estaba dedicada al uso público, autorizó su venta (12,019.4567) en tres parcelas segregadas de 4,019.4967 [.4567] m/c y otras dos de 4,000 m/c cada una. Autorizó la segregación ahí envuelta dispensando al Municipio del Reglamento, a fin de que el Registrador inscribiera las parcelas segregadas.

xix. Por Ley Núm. 9 de 15 de mayo de 1962, la Asamblea Legislativa autorizó al Municipio la venta de la parcela de 12,019.4567 m/c sin sujeción a subasta, por precio mínimo de $800,000.

xx. Según Informe Núm. 62-P-1401 de la Junta de Planificación fechado 14 de marzo de 1962, se autorizó al Municipio de San Juan a arrendar, para fines de estacionamiento, terrenos al Este de la Calle "Labra" esquina "Corchado" descritos como Parcela de 6,011.34 m/c en lindes por el Norte con la Calle "Labra" y J. J. Gerardino, Blanco Auto Service y Estación Texaco; Sur, Calle "Corchado" y terrenos de Autoridad de Acueductos y Alcantarillados y Municipio de San Juan; Este, con Municipio de San Juan y Gerardino, Blanco y Texaco, y Oeste, Calles "Labra" y "Corchado" y Autoridad de Acueductos. Presumiblemente, esta parcela de 6,011.34 m/c forma parte del polígono de 12,019.4567 m/c antes descrito y, posiblemente, aunque no podemos decirlo

con exactitud dada la anterior descripción, la "Plaza de Recreo" o parte de ella y la porción de la Calle "Del Rosario" en litigio, están igualmente incluidas.

xxi. En 22 de enero de 1964 la Junta de Subastas del Municipio de San Juan adjudicó el arrendamiento de la parcela de 6,011.34 m/c anteriormente descrita para fines de estacionamiento a Arcadio Morales por el canon de $635.00 mensuales. El contrato fue aceptado en 29 de enero de 1964.

xxii. En 1 de febrero de 1946, y en virtud de comunicación enviada al Registrador por el entonces abogado del Municipio de San Juan, Lcdo. Fernando B. Fornaris, el Registrador extendió nota al margen de la inscripción de la finca "El Relòj" haciendo constar las porciones separadas para calles en la partición de esta finca. Distinto a otras expresiones en cuanto a la Calle "Del Rosario", en este documento el Municipio hace constar a través de su abogado, que estas calles fueron "abiertas y puestas al servicio o dominio público, han estado y están en uso y aprovechamiento del pro común." En Certificación de 29 de noviembre de 1963 el Registrador certifica que con respecto a las áreas reservadas para calles no se ha practicado segregación alguna, y que la finca "El Reloj"—salvo las segregaciones hechas inscritas como fincas separadas—aparece inscrita a favor de Ángela, Juan, José-Víctor, Ángel y Casimiro Figueroa y Reyes y de Luis de la Cruz y de Enrique Adsuar Boneta.

xxiii. Ángela Figueroa Vda. de Torres Monge, por sí y en representación de otros de su clase, interpuso demanda contra el Gobierno de la Capital, fechada 25 de junio de 1945, Civil Núm. R-5777 del anterior Tribunal de Distrito de San Juan, sobre "Compensación y Daños". Alegó que las siguientes personas se encontraban en la misma posición que la demandante: José Víctor Figueroa, Rita de la Cruz Santiago, Casimiro Figueroa, Sucn. Enrique Adsuar, Ángel Figueroa Reyes y Juan Figueroa Reyes.

xxiv. Se alegó en esta demanda que en momento alguno la demandante ni los otros condueños cedieron, traspasaron o donaron gratuitamente al Municipio de San Juan los terrenos seleccionados para calles dentro de la finca "El Reloj", pero que sin su oposición y mediante el reconocimiento de sus derechos sobre los referidos terrenos así como el de ser compensados por el valor justo y equitativo de los mismos, el Municipio procedió a pavimentar y a dedicar al uso público *"algunas"* de las calles indicadas; que la Calle "Del Rosario" había sido *totalmente* suprimida incorporándose parte de ella a un solar propiedad del Municipio y parte a la parcela deslindada para plaza de recreo; que esos terrenos tenían un valor de $250,297.90 sin que el Municipio la hubiera compensado a ella ni a los otros condueños; que no había recibido compensación del Municipio por 2000 m/c que ocupaba la parte de la Calle "Del Rosario" incorporada por el Municipio a otra propiedad suya con un valor esta porción de $30,000; que el Municipio retenía y ocupaba el solar separado para plaza de recreo sin título alguno, así como otra porción de la Calle "Del Rosario" parte de este solar, teniendo ambos 4,000 m/c; que el Municipio había cedido esta propiedad a una entidad privada para el establecimiento de un parque atlético o con otros propósitos, privando a la demandante de esta propiedad, con valor de $80,000. Se solicitó en la súplica que se dictara sentencia obligando al Municipio de San Juan a satisfacer las sumas antes mencionadas.

xxv. El Municipio negó los hechos esenciales y entre otras cosas, alegó en su contestación enmendada que Administraciones anteriores habían levantado una edificación de madera sobre un trozo de la Calle "Del Rosario" la cual era removible, sin que tuviera la intención de apoderarse de un trozo de la referida calle por pertenecer a la comunidad en general al haber sido dedicada al uso público; que el Municipio no había incorporado parte de dicha calle a propiedad

suya, siendo lo cierto que Luis de la Cruz Santiago había vendido al Municipio por la escritura de 16 de enero de 1928 ante Martínez Dávila una parcela compuesta de 8530 m/c formada por otras dos y que fueron agrupadas como una sola finca incluyendo *"fraudulentamente"* el área que abarcaba la Calle "Del Rosario" entre las de "Figueroa" y "Labra", con una cabida de 1259.85 m/c; que el Servicio Insular de Parques de Puerto Rico procedió a construir un Parque de Recreo en la parcela destinada a "Plaza de Recreo" según la escritura Núm. 4 de 1922, y que dicho parque era un sitio enteramente público para los fines de su dedicación. En esta demanda se pretendió cobrarle al Municipio de San Juan el valor pecuniario de todas las áreas separadas para calles en la escritura de 1922 de división de la finca "El Reloj" así como el área destinada a "Plaza de Recreo". Posteriormente se enmendó la súplica para que en su defecto se ordenara la devolución y entrega a los demandantes de las referidas áreas.

xxvi. El caso Civil R-5777 fue fallado por sentencia de 10 de noviembre de 1948. En sus conclusiones de hecho determinó el Juez Cordovés Arana, entre otras determinaciones basadas en la prueba y en una inspección ocular:

1. Que la Calle "Del Rosario" estaba en parte abierta al público aunque sobre una porción de la misma el Municipio tenía construido un edificio de madera y columnas usado como garage desde 1940 y el cual interrumpía el tráfico por dicha calle. Que existían además otras construcciones del Municipio sobre la misma calle.

2. Que los otorgantes de la escritura Núm. 4 de 9 de enero de 1922 se encontraban en la misma posición legal que la allí demandante.

3. Que la parcela destinada a "Plaza de Recreo" estaba (al dictarse sentencia) abierta al público como un *parque atlético* administrado por la Comisión de Parques del

Gobierno Insular. El terreno del parque era poyaloso o pantanoso y para ser dedicado a parque atlético fue rellenado, nivelado y acondicionado, siendo a la fecha un sitio público en donde habían canchas de tenis y de baloncesto, un diamante para jugar pelota y otros aparatos de diversión para niños. Que estas obras fueron financiadas por el Programa de Emergencia de Guerra (P.E.G.) y auspiciadas por el Servicio Insular de Parques.

4. Que las dos parcelas agrupadas por Luis de la Cruz en la escritura Núm. 6 de 1928 ante Martínez Dávila y la 12 ante Martínez Rivera no colindaban entre sí, estando en medio la Calle "Del Rosario".

5. Que una porción de la Calle "Del Rosario" de 705.93 m/c al Este de la Calle "Labra" había sido incorporada al área del parque y se usaba como tal pero podía ser separada y convertida en calle nuevamente. La Calle "Del Rosario" estaba afirmada en parte y en parte sólo rellenada.

6. Que en relación con la tasación de la finca "El Reloj", los 50,018 m/c destinados a calles y los 4,500 destinados a "Plaza de Recreo" quedaron sin tributar desde el año 1922–23.

xxvii. Concluyó en derecho el Juez Cordovés Arana:

1. Que del hecho de que la demandante en aquel caso había renunciado a su primera causa de acción (en ésta se reclamaba el valor pecuniario de las áreas separadas para calles en el monto de $250,297.90), él podía inferir que ella y los otros habían aceptado que dichos terrenos para calles y plaza fueron "cedidos, traspasados y donados gratuitamente al extinto Municipio de San Juan", y por éste "dedicados al uso público para el cual fueron cedidos, *con excepción de un trozo de la Calle 'Rosario' y la parcela destinada a plaza.*"

2. Que de no ser lógica esa inferencia, llegaría a la misma conclusión por resultar de la prueba que los referidos terrenos habían quedado fuera de tributación desde el año 1922–23 por pertenecer los mismos al Municipio que los tenía dedicados al uso público, y por resultar, además, que los dueños de los solares adyacentes a dichas calles habían traspasado muchos de ellos a terceras personas, adquiriendo estos terceros el derecho al uso de esas calles conjuntamente con el público en general.

3. Concluyó el Juez Cordovés que la Calle "Del Rosario", en el trozo comprendido entre las de "Figueroa" y "Labra" había desaparecido totalmente y su superficie de 1259.85 m/c estaba *"dedicada por el Gobierno de la Capital a usos distintos a aquellos para los cuales fue donada."* Sobre 553.92 m/c de esa área el Municipio tenía edificaciones y los restantes 705.93 los había integrado al *Parque Atlético* administrado por la Comisión de Parques del Gobierno Insular.

4. Que la parcela donada para "Plaza de Recreo" había sido agrupada a un solar del Municipio junto a los 705.93 m/c de la Calle "Del Rosario" y en esta área se construyó el *Parque Atlético* financiado con fondos del Programa de Emergencia de Guerra.

5. Concluyó el Juez Cordovés Arana que el Gobierno de la Capital se apartó o desvió de los fines para los cuales "se hizo la dedicación y consagración" en cuanto al referido trozo de la Calle "Del Rosario" y la parcela para plaza pública, si bien en cuanto a ésta, el fin para el cual estaba siendo dedicada no era "inconsistente" con el propósito para el cual "fue donada". Determinó el Magistrado que había una diferencia entre una "Plaza de Recreo" y un "Parque Atlético". Determinó igualmente que en dicha área el Municipio podía construir la "Plaza de Recreo" en la parcela "donada" a este fin y al mismo tiempo conservar el *Parque* en los terrenos que eran de su propiedad.

6. Finalmente concluyó que estas actuaciones del Municipio no revelaban un abandono suyo de la "dedicación" y que tampoco daban lugar a que los terrenos revirtieran a sus antiguos dueños *ya que su uso continúa siendo del público.*" Que en cuanto al trozo de la Calle "Del Rosario" dedicado por el Municipio a fines distintos para los que fue "donada" dicha Calle, el Municipio "podría ser obligado al cumplimiento específico de la dedicación, removiendo las estructuras que existen sobre el mismo, que de acuerdo con la prueba pueden ser fácilmente removidas, y reconstruir dicho trozo de calle *para abrirlo al público.*"

xxviii. Resolviendo, por los fundamentos expuestos, que la allí demandante y personas en posición parecida no tenían base legal para recobrar los terrenos envueltos en ese pleito ni su valor pecuniario, y que el remedio podría ser la acción para obligar al Municipio de la Capital al "cumplimiento específico de las condiciones de la dedicación", se declaró sin lugar la demanda, Civil Núm. R-5777.

(19) La Sala sentenciadora en el presente recurso concluyó al disponer del caso:

i. Que había identidad de partes entre los aquí demandantes y los demandantes en el pleito R-5777, siendo los ahora demandantes causahabientes de aquéllos, excepto Ángela Figueroa que sobrevive.

ii. Que existía identidad de cosas con el anterior pleito.

iii. Que habiendo quedado establecido en el pleito R-5777, como en éste, que los terrenos en controversia pasaron del dominio privado de los demandantes al dominio público, ya estaba judicialmente adjudicado que los demandantes no son dueños de los predios en litigio.

iv. Y "que siendo la sentencia dictada en el caso anterior, R-5777, final y firme, existiendo la más perfecta identidad en los litigantes y sus causahabientes y las cosas y

causas objeto del pleito ya que la referida sentencia resuelve definitivamente *el asunto del título,* es inescapable la conclusión de que procede declarar con lugar la defensa de cosa juzgada. *Muñoz* v. *Pardo,* 68 D.P.R. 612–616 (1948) ; *Silva* v. *Doe,* 75 D.P.R. 209, 214 (1953) ; *Araújo* v. *Arenas,* 60 D.P.R. 284, 296–297 (1942)."

"Pero aun asumiendo que no prosperare la defensa de cosa juzgada, no podría discutirse ni *re-litigarse* en este pleito *la cuestión del título del Municipio* sobre los terrenos en controversia ya que el hecho específico del título a favor del Municipio es un hecho esencial *(ultimate fact)* previamente adjudicado entre las partes en el tantas veces mencionado caso R-5777, el cual no puede ser objeto de nueva litigación bajo la teoría del impedimento colateral por sentencia *(colateral estoppel by judgment). Fuentes* v. *Tribunal de Distrito,* 73 D.P.R. 959, 980 (1952) ; *Pereira* v. *Hernández,* 83 D.P.R. 160 (1961)

v. Considerando que el pleito resultaba ser cosa juzgada en cuanto al hecho esencial del título del Municipio, o que había *impedimento* para impugnarlo por haberse adjudicado ya por sentencia firme, la Sala expresó que creía innecesario fallar otras cuestiones de derecho y procedió a desestimar la demanda. Entre esas otras cuestiones de derecho reservadas mencionó *"la reversión* de la posesión al donante o sus causahabientes *si el uso público es abandonado* en cualquier tiempo y por cualquier motivo."

—III—

*Consideración de la Cuestión Litigiosa*

A.—*La Cosa Juzgada.*

Entre las presunciones que establece el Código Civil—Art. 1204, ed. 1930—se dice que "Contra la presunción de que *la cosa juzgada es verdad,* sólo será eficaz la sentencia ganada en juicio de revisión."; que para que la presunción surta

efecto en otro juicio, "Es necesario que entre el caso resuelto por la sentencia y aquel en que ésta sea invocada, concurra la más perfecta identidad entre las cosas, *las causas*, las personas de los litigantes y la calidad con que lo fueron." (Énfasis nuestro.) Más adelante: ". . . que hay identidad de personas siempre que los litigantes del segundo pleito sean causahabientes de los que contendieron en el pleito anterior, o estén unidos a ellos por vínculos de solidaridad o por los que establece la indivisibilidad de las prestaciones entre los que tienen derecho a exigirlas u obligación de satisfacerlas."

La presunción de la cosa juzgada tiene bien definidas excepciones en ley, y de orden equitativas. *Pérez* v. *Bauzá*, 83 D.P.R. 220, 225 (1961); *Millán* v. *Caribe Motors Corp.*, 83 D.P.R. 494, págs. 505, 510 (1961); *Suárez Fuentes* v. *Tribunal Superior*, 88 D.P.R. 136, 151 (1963); *Viera* v. *Comisión Hípica*, 81 D.P.R. 707, 720 (1960); *Tartak* v. *Tribl. de Distrito*, 74 D.P.R. 862, 870 (1953); *Vidal* v. *Monagas*, 66 D.P.R. 622, 631 y sgs. (1946) y véanse opinión confirmando en 179 F.2d 99, 106; *cert.* denegado, 335 U.S. 911; *Riera* v. *Pizá*, 85 D.P.R. 268, 274 y sgs. (1962); *Rodríguez* v. *Sucn. Pirazzi*, 89 D.P.R. 506, págs. 518 a 520 (1963); *Feliciano Ruiz* v. *Alfonso Develop. Corp.*, 96 D.P.R. 108, 113 (1968).

Surge inicialmente en la consideración de este aspecto del recurso, el problema que señala la manera representativa en que se han interpuesto ambas acciones, la del pleito R-5777 y ésta.

La demanda R-5777 no es una interpuesta afirmativamente por todos los otorgantes de la escritura Núm. 4 de 1922 como co-partes en una demanda. (Reglas 19 y 20 de Enjuiciamiento Civil de 1943.) Compareció allí únicamente Ángela Figueroa y aparentemente asumió una representación alegando que otras personas mencionadas se encontraban en la misma posición legal y de hecho que la de ella. El Municipio negó esta alegación como cuestión *de hecho*. Aparentemente esa fue una acción bajo la Regla 23 de 1943, que permitía el

pleito de clase. Bajo esa Regla, una persona podía asumir la representación de otras cuando la naturaleza del derecho solicitado a favor o en contra de la clase fuera:

"(1) Conjunta, o común, o subsidiaria, en el sentido de que el propietario *del derecho primario* rehusa hacer valer dicho derecho y un miembro de la clase, por lo tanto, adquiere el derecho a reclamarlo;

"(2) *Separada* y el objeto del pleito sea la adjudicación de reclamaciones que afecten o pudieran afectar una propiedad específica envuelta en la acción; o

"(3) *Separada* y existiere una cuestión común de derecho o de hecho que afectare *los distintos derechos* y se solicitare un remedio común." (Regla 23, 1943.) Esta Regla le dio aquí vigencia a la Regla 23 de las de Procedimiento Federal.

El presente pleito se instó bajo la Regla 20.1 de las de Procedimiento Civil de 1958. En esencia y sustancia es igual a la de 1943, sólo algunos cambios en la exposición.[3]

En *Caguas L. Y., Inc.* v. *Tribunal Superior*, 96 D.P.R. 848, decidido en 28 de enero de 1969, seguimos la glosa judicial de otras jurisdicciones que cataloga la acción de clase bajo el párrafo (1) como la genuina acción de clase; aquella bajo el párrafo (2) como una acción de clase híbrida, y la del párrafo (3) como acción de clase espuria.[4]

Llegamos a la conclusión de que no es necesario ahora adentrarnos en una consideración y discusión pormenorizada

---

[3] Al igual que la de 1943, la Regla 23 Federal de 1937 dispone en sus apartados (2) y (3):

"(2) *Several*, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

"(3) *Several*, and there is a common question of law or fact affecting the *several rights*, and a common relief is sought".

En las Reglas de 1958 el vocablo *"several"* aparece traducido indebidamente como "'solidario".

[4] Para el efecto que cada una de estas clasificaciones tiene en lo que respecta a la presunción de cosa juzgada, véase el conocido estudio de actualidad aún, de James Wm. Moore y Marcus Cohn, *"Federal Class*

en cuanto a la clasificación en que caen los pleitos aquí llevados, y su efecto en lo que respecta a la cosa juzgada. El récord nos convence, con independencia de los anteriores factores, que no procedía por parte de la Sala sentenciadora sostener la defensa de cosa juzgada, aun en cuanto a la propia Ángela Figueroa, única compareciente directa en ambos litigios.

La escritura Núm. 4 de 9 de enero de 1922, base del pleito, expresa literalmente: "Que los condueños de la finca El Reloj han tenido diversas conferencias y reuniones para tratar de esta división y últimamente se reunieron en San Juan, en las oficinas del Banco Comercial de Puerto Rico con fecha nueve de Octubre de mil novecientos veintiuno, y acordaron llevar a cabo la división material de una parte de la finca El Reloj antes descrita, *determinando al efecto, para el mejoramiento de la finca en beneficio de todos*, las diversas *calles y plaza de recreo* previamente convenidas; las cuales son las siguientes:" (Se describen.) (Énfasis puesto.)

La anterior es toda la expresión en el récord que serviría de base al criterio de una "cesión" de la propiedad por parte de sus dueños o de una "aplicación" o "destino" de las áreas de calles y plaza "en beneficio de todos." Resolvió el Juez Cordovés y quedó claramente adjudicado en su sentencia, en lo concerniente a la plaza de recreo y a la parte de la calle "Del Rosario" que ahora se litigan, que el Municipio no les estaba dando el uso público para el cual habían sido "cedidas".

La calle, porque había levantado el Municipio una edificación en parte de ella que interrumpía el tránsito, y la otra porción la había integrado a la plaza; y la plaza, porque no estaba siendo usada como "plaza de recreo" que era el uso para el cual había sido "cedida" por los dueños, sino

*Actions—Jurisdiction and Effect of Judgment*", 32 Ill. L. Rev. 555; "*Binding Effect of Class Actions*, (Nota) 67 Harv. L. Rev. 1059; Moore's *Federal Practice*, 2nd Ed. 1968, Vol. 3, págs. 3434 *et seq.*, 3456 *et seq.; cf. Supreme Tribe of Ben-Hur* v. *Cauble*, 255 U.S. 356; *cf. O'Hara* v. *Pittston Co.* (Va.), 42 S.E.2d 269.

que conjuntamente con la porción de la calle "Del Rosario" que le adicionaron, era usada públicamente como *parque atlético*, siendo de opinión el juez que el uso de "plaza de recreo" y el de "parque atlético" no eran el mismo uso público.

Considerando el Juez Cordovés que la edificación levantada en parte de la calle "Del Rosario" era fácilmente removible, y que la parte integrada a la plaza era restituible como calle; y considerando que el uso público a que estaba destinada la "plaza de recreo" como parque atlético no era "inconsistente" (*"incompatible"*) con aquel a que fue destinada por los dueños, y que era fácil mantener ambos usos públicos, el parque atlético en terrenos que allí pertenecían al Municipio, y la plaza en el terreno destinado para ello, resolvió y fallo el Juez Cordovés, ante esa situación *de hechos*, que no era procedente declarar con lugar aquella demanda y compensar a la allí demandante y a los otros en el valor de tales terrenos. En abono de lo decidido, expresó el Juez Cordovés que los dueños tenían una causa de acción para obligar al Municipio a restituir el uso público destinado por ellos.

Nada hay en el fallo del Juez Cordovés en el pleito R-5777, que adjudicara a favor del Municipio el *título patrimonial* sobre estos bienes, que es el hecho sustancial que se litiga en el presente caso. No podía haber quedado allí juzgado este hecho esencial al actual pleito, ya que los acontecimientos del retiro permanente de esos bienes del uso público, y en su consecuencia, la *conversión* por el Municipio de los mismos a su haber *patrimonial*, occurrieron con posterioridad al haberse dictado sentencia en el pleito anterior. (5)

_____

(5) Una sola vez, en la parte expositiva, el Juez Cordovés se refirió a los terrenos traspasados o donados al Municipio de San Juan y dedicados por éste al uso público. No puede interpretarse esa expresión como una que adjudicó un derecho *patrimonial* porque tal interpretación sería incompatible con el propio fallo del Juez Cordovés al determinar que los bienes estaban dedicados en parte a un uso público y era fácil restituirlos al uso destinado por los dueños, y al reconocer en éstos una causa de acción contra el Municipio, en las circunstancias de aquellos hechos, para

En *Chabrán* v. *Méndez*, 74 D.P.R. 768 (1953), ya habíamos dicho sobre lo anterior citando de *Restatement, Judgments*, Sec. 54, pág. 211 (74 D.P.R. págs. 782–784):

" 'Cuando se dicta sentencia a favor de un demandado por el fundamento de que no existe un hecho esencial a la causa de acción del demandante, éste no está impedido de radicar otro pleito *al surgir luego ese hecho* .... En tal caso si el demandante insta su acción antes de que el evento ocurra, y se dicta sentencia a favor del demandado por dicho motivo, el demandante no está impedido de instar una acción después de ocurrido el evento.' " (Énfasis puesto.)

En *Fels* v. *Biascoechea*, 77 D.P.R. 681, citando de 2 Freeman, *Judgments*, 5ta. Ed., págs. 1501–4, reafirmamos lo dicho en *Chabrán*, ante, (77 D.P.R. 685–686):

" 'Y lo mismo es cierto con respecto a una decisión de que no existe derecho o causa de acción alguna; ésta no impide una segunda acción *cuando los hechos nuevos han creado un derecho o causa de acción'* .... (Énfasis puesto.)

... Toda vez que en la demanda que ahora está ante nos se alega específicamente que 'liquidado el negocio entre demandante y demandado ... resultó un balance a favor del demandante y contra el demandado ... ', ese nuevo hecho crea una causa de acción en favor del demandante, y, a tenor de las citas anteriores, las sentencias dictadas por los tribunales del país vecino no resultan ser *res judicata*."

■ En el pleito ante nos, el hecho esencial que dio base a ejercitar esta causa de acción surgió, como razón de pedir

compelerlo a mantener los bienes en el uso destinado. Esa expresión es más bien producto de la tendencia que ha habido en muchas expresiones judiciales a no hacer la requerida distinción entre el bien de uso público y el bien *patrimonial* del Estado u organismos públicos, y la tendencia a confundirlos. Recientemente este Tribunal tuvo ocasión de hacer las debidas aclaraciones en *Rubert Armstrong* v. *Estado Libre Asociado*, 97 D.P.R. 588, resuelto en 27 de junio de 1969. Y véase, con iguales fines aclaratorios, la expresión del Juez Asociado Señor Hernández Matos de 27 de junio de 1969 en *Estado Libre Asociado* v. *Tribunal Superior*, 97 D.P.R. 644. (En reconsideración), en la cual concurrieron el Juez Presidente y este Juez.

de un remedio judicial, con posterioridad al fallo del pleito R-5777, o sea, surgió al terminarse definitivamente en 1957, por acción gubernamental, el uso y dominio del público de la plaza y de la porción de calle en litigio, y darse el Municipio a sí mismo un título de dominio *patrimonial y privativo* sobre dichos bienes según la Certificación Núm. 465 de 7 de abril de 1958 ya mencionada y las Ordenanzas 84 de 1956–57 y 85 de 5 de junio de 1957.

Por los fundamentos expresados, no procedía el sostener en este pleito la defensa de la cosa juzgada.

### B.—*El Título.*

Ante el cuadro de hechos que surge del récord, la cuestión litigiosa gira en torno al derecho de propiedad de los demandantes sobre estos bienes contra el derecho de propiedad que con carácter *patrimonial* y privativo el Municipio alega tener sobre los mismos.

Por no ser idénticas las circunstancias en cuanto a la porción de calle y en lo que respecta a la plaza, trataremos por separado cada caso.

1.—*La Plaza.*

Distinto a la situación *de hecho* que de ordinario presentan los casos decididos en donde existe el traspaso formal de título propietario de unos bienes a una entidad gubernamental, con la condición impuesta de que han de ser dedicados al uso y dominio del público, es un hecho irrefutable que en éste la demandante Ángela Figueroa Reyes y los causantes de los demás co-demandantes no cedieron ni traspasaron título *patrimonial* alguno a favor del Municipio de los 4,500 m/c que en la escritura Núm. 4 de 9 de enero de 1922 ellos separaron para plaza de recreo. Todo lo que se expresa en dicha escritura es lo que ya antes mencionamos: que reunidos los condómines, (citamos):

"... acordaron llevar a cabo la división material de una parte de la finca El Reloj antes descrita, *determinando al efecto, para*

*el mejoramiento de la finca en beneficio de todos,* las diversas calles y plaza de recreo previamente convenidas; las cuales son las siguientes:" (Se describen.) (Énfasis nuestro.)

Es un hecho irrefutable que la plaza de recreo fue real y efectivamente destinada al uso y dominio del público, y así lo adjudicó el Juez Cordovés Arana en su sentencia de 1948. Siguió destinada a tal uso y dominio del público hasta que el Municipio, con la anuencia de la Junta de Planificación, terminó dicho uso y dominio en 1957 y por la Certificación Núm. 465 de 7 de abril de 1958 inscribió dicha plaza en el Registro como un bien *patrimonial* y privativo suyo.

Es otro hecho irrefutable que a partir de esta conversión en 1957, el Municipio ha estado en la posesión de la plaza y ha realizado actos de pleno dominio sobre ella, como el hecho de agruparla con otros predios privativos suyos y así agrupada tratar de venderla o permutarla, y luego arrendarla a tercero para estacionamiento de vehículos. A la luz de estos hechos, cualquier título *patrimonial* o privativo del Municipio habría de surgirle por vía de la prescripción adquisitiva, en ausencia de un título escriturario de cesión y traspaso del *dominio* por parte de los dueños, y en ausencia de legislación especial sobre la materia que dispusiera, en esas circunstancias, la consolidación de un título *patrimonial* a favor del Municipio. Al aspecto de la prescripción nos referiremos un poco más adelante.

El problema al cual aquí nos enfrentamos, sobre el destino de bienes que han estado dedicados al uso y al dominio del público al terminar tal uso y dominio, tiene hondas raíces históricas en ambos sistemas occidentales de jurisprudencia, latino y sajón.

Están fuera de estas consideraciones el bien de uso y dominio público que nunca es susceptible del comercio de los hombres, y que carece de la condición de ser alienable y pres-

criptible, a distinción de aquellos bienes que, de naturaleza alienable y en el comercio de los hombres, son destinados o aplicados al uso y dominio del público y luego cesa tal uso. Este segundo tipo de bienes es el envuelto en esta litigación. *Cf. Rubert Armstrong* v. *E. L. A.*, 97 D.P.R. 588 (1969).

En varias jurisdicciones estatales americanas existe legislación positiva que reglamenta *a priori* todo lo concerniente a la dedicación y aplicación de bienes privados al uso y dominio del público, incluyendo las cuestiones de título. Esta legislación positiva a veces ha modificado normas históricas de la Ley Común inglesa, y en tal caso, el destino y aplicación por un dueño de sus bienes al uso y dominio del público se rige, tanto en los aspectos sustantivos como en los de forma, por esas expresiones de ley positiva y su acto engendra aquellas consecuencias jurídicas que la legislación dispone. [5-a]

■ Bajo las normas clásicas de la Ley Común inglesa, en ausencia de legislación positiva que las modifique y en ausencia de expresión de voluntad del dueño cediendo o traspasando su título o imponiéndole restricciones al mismo, las cortes estatales americanas están de acuerdo, siguiendo la Ley Común, en que terminado el uso y dominio del público sobre bienes alienables que fueron aplicados a tal uso, los mismos revierten al uso y disfrute del dueño que así los destinó y aplicó. En tal caso, no ha habido desprendimiento de título, y tanto la doctrina latina como la Ley Común inglesa coinciden en el criterio de que en tal situación la intervención del Estado, el Municipio o de cualquier otra entidad pública es una de orden *reguladora* en la capacidad de un *administrador*, y no en la capacidad de un propietario. [6]

(5-a) Fred Zengel—*Elements of the Law of Ownership*, comentando el Título II del Código Civil de Louisiana. West's, L.S.A. Civil Code, 3, pág. 1 y ss.; pág. 17.

(6) "Ya hemos indicado que, en nuestra opinión, el derecho de la persona moral, *Estado, departamento, municipio*, sobre los bienes de su dominio público no es un derecho de propiedad pues no comprende los

En lo que respecta al Libro II—Propiedad—del Código Civil, en su Código Civil de 1808 así como en la revisión de éste que hiciera en 1825, Louisiana se apartó en aspectos básicos del Código de Napoleón de 1804, con sus disposiciones éste sobre dicho Libro más afines y semejantes a las que luego forman parte del articulado del Código Civil Español. Louisiana prefirió acogerse a principios de la Ley Común sobre la

atributos esenciales de la propiedad *usus, fructus, abusus.* El dominio público pertenece, *en tanto que dura su afectación,* más bien al uso público que a la persona moral de que depende. La persona moral no tiene sobre esta parte de su dominio más que un derecho de *guarda,* de *gestión,* de *administración,* [énfasis del autor] y no, como se ha dicho—equivocadamente en nuestra opinión—derecho de propiedad."—Colin y Capitant, *Curso Elemental de Derecho Civil,* Tomo Segundo, Vol. II, 3ra. Ed., 1952, págs. 71 y ss.; pág. 80.

Citando abundantes autoridades, se dice en *Town of Choteau* v. *Blankenship* (Oklahoma), 1944, 152 P.2d 379, pág. 383:

"The general rule is that in the absence of a statute to the contrary the title to streets and alleys is held by the municipality *in trust, not in a proprietary capacity,* and the municipality is without power to alienate the same.

"By the great weight of authority a municipality cannot be divested of title to its streets *held in trust* for public use by adverse possession for the prescriptive period. [citas]. We think this is the sound rule and adhere to it." (Énfasis nuestro.)

En el connotado caso de *City of Fort Worth* v. *Burnett* (Texas), 1938, 114 S.W.2d pág. 220, ya se había dicho lo mismo; pág. 223:

"It is established by the authorities that, where property is appropriated to public use by common law dedication of the owner, the municipality within whose borders the premises are situated *takes it,* as *trustee for the public,* for the special uses designated by the dedicator."

En este caso se destinó por su dueño un predio para plaza o parque que proveyera espacio libre para respirar, y la Corte Suprema de Texas resolvió que Fort Worth no podía usar parte del terreno para edificar una biblioteca pública.

Reafirmándose el principio, se repite en *Hyland* v. *City of Eugene* (Oregon 1946), 173 P.2d 464, pág. 466:

"It is the universally accepted rule of law that land dedicated by a private owner for a specific purpose must be used in conformity with the terms of the dedication and not diverted to any other purpose. [citas], . . . When such a grant has been made by a private owner, the *municipality,* by accepting the dedication, *becomes a trustee* to carry out the terms of the grant *and it has no power to sell or lease the property* for purposes foreign to the dedication. [citas]

propiedad, codificando esos principios en legislación positiva. Así:—su Art. 482 actual (Art. 474 Código Civil 1825), que se aparta del Código Napoleónico y del Español, y reza:

"Entre las cosas que no son susceptibles de apropiación están comprendidas aquellas que no pueden ser propiedad particular por razón de su objeto, tales como las cosas en común o sean aquellas cuyo uso y disfrute pertenece a todos los hombres.

"Hay cosas, por el contrario, que aunque por su naturaleza son susceptibles de propiedad particular, *pierden* esta cualidad como consecuencia de la *aplicación* que de ellas se hace para fines públicos incompatibles con la propiedad privada, si bien *pueden adquirir su primitiva condición* tan pronto cese el fin público que se las hubiera dado; tales son las carreteras, calles y plazas públicas". LSA C.C. Art. 482.

Según el anterior Art. 482, aquellos bienes en el comercio de los hombres con condición de alienables que se han aplicado o destinado al uso y dominio del público dejan de ser propiedad particular por *incompatibilidad* de uso, pero si el uso público termina, readquieren su condición primitiva de bien particular del dueño; ya el dueño sea un individuo, o ya sea el propio Estado o municipio o entidad pública en su capacidad patrimonial. (⁷)

---

"In determining whether there has been a misuse or diversion of the property, courts *are more strict* in cases of grant by private owners."

Este último criterio en cuanto a la interpretación más estricta contra el distinto uso cuando la dedicación al uso público ha sido hecha por un dueño privado, que cuando ha sido dedicada la propiedad al uso público por las propias entidades gubernamentales, es igualmente de general aceptación por las cortes.

(⁷) En su Art. 658 sobre servidumbres, declara Louisiana que aquella parte de la propiedad sujeta a una servidumbre no deja de pertenecer al dueño, y que por lo tanto el *lecho o terreno* de una *carretera pública* pertenece al propietario o dueño, y al público le corresponde su uso. Por supuesto, lo anterior no aplicaría si el Estado o entidad pública ha expropiado un título dominical del terreno o si ha adquirido dicho título consensualmente, o si existe un estatuto que rige la materia de distinto modo y exige el cumplimiento de ciertas formalidades. *Cf. Lamartiniere* v. *Daigrepont* (La.), 168 So.2d 373, 376.

En Puerto Rico rige idéntico orden civil. En lo que concierne al Libro Segundo—Propiedad—la Comisión Codificadora de 1901 creada por la Ley Foraker prefirió adoptar mucho del articulado del Código Civil de Louisiana de 1825, por sobre las disposiciones del Código Civil Español que nos regía desde el lro. de enero de 1890.

Esta fue una preferencia consciente y deseada, por cuanto de los tres Comisionados, correspondió al connotado civilista y legislador puertorriqueño Don Juan Hernández López la labor de preparar el Código Civil que luego fue aprobado por la Asamblea Legislativa por Ley de lro. de marzo de 1902 y nos rige desde el lro. de julio de ese año. ([8])

Así, se trajo literalmente a nuestro orden civil el Art. 482 de Louisiana antes transcrito y comentado, como el Art. 349 del Código Civil de 1902 que continuó en vigor como el 274 de la edición de 1930.

---

([8]) *Informe de la Comisión para Revisar y Compilar las Leyes de Puerto Rico.* Washington, Imprenta del Gobierno, 1901. Dice Don Luis Muñoz Morales:

"No obstante esa declaración y a pesar de que la revisión del Código Civil fue confiada al Comisionado Puertorriqueño, se notó bastante en este Código *la influencia del Criterio Norteamericano,* porque no sólo se hicieron aquellas modificaciones que naturalmente exigía el cambio de régimen, *sino que se intercalaron artículos del Código de Louisiana,* e introdujeron otras doctrinas radicalmente opuestas a nuestro histórico Derecho Civil, y la explicación que se dá en el informe de nuestro comisionado puertorriqueño, después de sostener un criterio de adaptación gradual, pero no de igualdad, a las instituciones de los Estados y Territorios de la Unión, dice textualmente:

'Tales principios y tal criterio han servido de base a la revisión del Código Civil, y si de algo peca es más bien por haber caído del lado de la reforma en muchos casos, no tanto por convencimiento de que algunas de las instituciones actuales reformadas no sean buenas, cuanto por el deseo de demostrar prácticamente el amor ferviente al principio de identidad *en todo lo que pueda parecer justo* o siquiera *racional.*'" (Énfasis suplido.) *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico.* Libro Primero págs. 23 y ss.

La Asamblea Legislativa nombro su propia comisión conjunta de la Cámara y el Consejo Ejecutivo para estudiar el Código sometido por los Comisionados, y aceptó igualmente las adopciones hechas de Louisiana.

En una decisión de 1865, Louisiana interpreta y aplica el Art. 474 de 1825, igual a su Art. 482 actual, en el sentido de que al cesar el uso público de una faja de terreno dedicada por su dueño a carretera, el título pertenecía al dueño y no a propietarios adyacentes a dicha vía. Se resuelve que el hecho de que el dueño vendiera solares adyacentes a la carretera no constituía hecho suficiente de desprendimiento de su título que le privara del mismo conforme al Art. 474 (482). *Méndez* v. *Dugard*, 29 La. Reports 116, 117. Así había sido interpretado el Art. 482 cuando lo adoptamos en 1902.

El anterior principio se reafirma en otro conocido caso —*Louisiana Highway Commission* v. *Raxdale* (La. 1943), 12 So.2d 631, págs. 634 y ss. Aquí, un causante de los demandantes vendió al Municipio de Alexandria en 1868 por escritura pública que fue registrada, una faja de terreno parte de un predio mayor, haciéndose constar que era para calle. El precio, $50.00. De hecho la faja nunca se usó como calle y se consideró que el uso público había sido abandonado. Aplicando y siguiendo el Art. 482 en el sentido de que este era un bien susceptible de revertir a la propiedad privada terminado el uso público, o en ausencia de tal uso, la Corte sostuvo que si bien el causante de los demandantes había traspasado título a favor de la municipalidad por escritura registrada, él y los demandantes, sus causahabientes, habían estado en posesión del predio como dueños por más de 30 años y a éstos favorecía un título por prescripción adquisitiva contra la municipalidad.

En *Ferrente* v. *Tantilla* se ratifica la norma y se dice, 42 So.2d 379 (La) 1949, a la pág. 381:

"No hay duda bajo la jurisprudencia de este estado que cuando se abandona una carretera pública, la porción abandonada revierte a la propiedad privada de la persona dueña del terreno por sobre que pasa. Véase *Goree* v. *Midstates Oil Cor-*

*poration*, 205 La. 988, 18 So.2d 591, y el *Artículo 482* del Código Civil de Louisiana."

En este caso se resolvió, no obstante, que como cuestión de hecho el uso público no había terminado o se había abandonado.

En la decisión posterior de *Green* v. *Chamberlain*, (La.) 1952, 60 So.2d 120, en una amplia discusión a las págs. 125 y ss., se dice después de citarse *verbatim* el Art. 482: "Es de notarse que el artículo no hace sitios públicos *per se* no susceptibles de propiedad particular, sino solamente cuando se destinan a un propósito público *incompatible con la propiedad privada*." (Énfasis en la decisión.)

En un caso de mucho parecido con el presente en sus hechos, un propietario en 1812 marcó en plano de su propiedad un "predio" destinado a plaza pública de recreo. En efecto, el predio así se usó por el público hasta 1886. En 1882 la municipalidad, por ordenanza, traspasó o intentó traspasar la plaza a la Junta de Educación, y en 1886 ésta erigió en ella una escuela, cesando el uso público como plaza. La Junta instó acción contra los herederos del dueño para hacer prevalecer su título sobre el de éstos.

La Corte Suprema de Kentucky—*City of Bowling Green* v. *Board of Education, et al*, 278 S.W.2d 726—antes esos hechos resolvió que al traspasar la municipalidad el predio a la Junta cesó el uso público de la plaza, y en ese momento el título del predio así destinado revertió al dueño original. Con abundantes citas de autoridades, dijo la Corte: (pág. 727)

"Cuando propiedad que ha sido destinada al uso público es abandonada o cedida, el derecho del público termina, y la propiedad en derecho revierte al que así la destinó." (citas)

Resolviendo entonces la cuestión del título entre la Junta y los herederos del dueño, sostuvo la corte que el título había

revertido a éstos en 1886 cuando cesó el uso público y la Junta edificó la escuela, pero habiendo estado la Junta en la posesión pública y exclusiva del predio desde esa fecha y por tiempo suficiente, su posesión adversa a la de los herederos le daba un título superior dominical al de éstos, por prescripción adquisitiva. Igual doctrina básica ha seguido California al cesar el uso público de calles. *Cf. Loma Vista Investment* v. *Roman Catholic Archbishop*, 1958, 322 P.2d 35, 38.

No ponemos en tela de juicio la facultad que tenía el Municipio de San Juan para sacar del uso público la plaza y la calle, siguiendo, como los siguió, los procedimientos de ley a tal efecto. El cerrar una calle o eliminar una plaza de recreo puede ser una función gubernamental necesaria para beneficio general, bajo el poder de policía del Estado. Con el correr del tiempo y con los desarrollos urbanos, el gobierno no puede quedar atado para siempre por un uso a la propiedad fijado en época remota por su dueño.[9]

El Art. 274 del Código Civil, ed. 1930, idéntico al 482 de Louisiana, dispone:

"Entre las cosas que no son susceptibles de apropiación están comprendidas aquellas que no pueden ser propiedad particular por razón de su objeto, tales como las cosas en común o sean aquellas cuyo uso y disfrute pertenece a todos los hombres.

Hay otras cosas, por el contrario, que aunque por su naturaleza son susceptibles de propiedad particular, pierden esta cualidad como consecuencia de la aplicación que de ellas se hace para fines públicos incompatibles con la propiedad privada, si

---

(9) Véanse: en el cuadro general de ilustración, *Central Land Co.* v. *Grand Rapids* (Mich.) 1942, 4 N.W.2d 485 y monografía en 144 A.L.R. 487; los casos ya citados de *Hyland* v. *City of Eugene* (Oregon); *Town of Choteau* v. *Blankenship*, (Oklahoma); *City of Fort Worth* v. *Burnett* (Texas); *Lamartiniere* v. *Daigrépont* (La.); Tul. L. Rev. Vol. XII, *Comments*, págs. 428 y ss.; pág. 429; Vol. 13, *Comments*, *"The Effect of Dedication to Public Use in Louisiana"*, págs. 606 y ss. En la jurisprudencia de Louisiana debe tenerse en cuenta que algunas decisiones descansan en legislación especial separada o complementaria del Código para regir determinadas situaciones.

bien pueden adquirir su primitiva condición tan pronto cese el fin público que se las hubiera dado; tales son los terrenos de las carreteras, calles y plazas públicas."

No habiéndose otorgado título escriturario por los comparecientes en la escritura de partición Núm. 4 de 9 de enero de 1922 enajenando el dominio a favor del Municipio de San Juan; en ausencia de legislación especial sobre la materia disponiendo del título en tales casos, como ocurre en varios estados; (*) y conforme al Art. 274 según ha sido autorizadamente interpretado y aplicado en las jurisdicciones de su procedencia, debemos resolver que al cesar definitivamente en 1957 el uso y dominio público de la plaza de recreo por acción del Municipio mediante el procedimiento de ley dispuesto para ello, dicha plaza *adquirió su primitiva condición* de propiedad privada de sus dueños.

■ Los bienes dedicados al uso y dominio público, y así usados por la comunidad en general, no producen prescripción a favor o en contra de nadie. En esto también están de acuerdo la doctrina sajona y la latina. Véanse: Art. 1836 Código Civil ed. 1930, Colin y Capitant, *op. cit.*, pág. 73, *Louisiana Highway Commission* v. *Raxdale*, antes citado, a la pág. 635; *Locke* v. *Lester* (La.), 1955, 78 So.2d 14, pág. 16.

■ El récord demuestra, no obstante, que al cesar en 1957 el uso y dominio público de la plaza, el Municipio quedó en posesión y realizó actos de dominio sobre ella, según hemos expresado. A partir de ese momento comenzó a correr la prescripción adquisitiva a favor del Municipio en razón a su posesión adversa a la de los demandantes. Habiéndose interpuesto la presente acción judicial en 11 de diciembre de 1962, el Municipio no poseyó durante el término mínimo requerido

---

(*) Véanse, por ejemplo, disposiciones tales como las secciones 837, [*sic*] 8324, 8330, 8331, de la legislación de California, que siguen las normas de la Ley Común. West's, *Ann. Str. & H. Code,* secciones mencionadas.

bajo cualquier tipo de prescripción para obtener título de dominio por prescripción adquisitiva.

Por todos los anteriores fundamentos, la sentencia que desestimó la demanda será revocada en lo que respecta a la plaza. Se dictará otra decretando que a partir de 1957 al cesar el uso y dominio público los demandantes, como otorgantes y causahabientes de los otorgantes de la escritura Núm. 4 de 9 de enero de 1922, ostentan título de dominio sobre dicha plaza, decretando la nulidad de la Certificación Núm. 465 de 7 de abril de 1958 y las operaciones que dieron lugar a dicha Certificación, y decretando la nulidad de la inscripción de esta propiedad en el Registro a favor del Municipio de San Juan como bien patrimonial y privativo suyo.

2. *La Calle Rosario.*

El récord contiene expresiones contradictorias del Municipio hechas oficialmente en distintas épocas en cuanto a si la Calle Rosario fue o no de uso y dominio público. En su sentencia de 1948 el Juez Cordovés Arana concluyó que la Calle había sido usada públicamente, aunque el Municipio había obstaculizado la vía con una edificación removible.

Aparte de ello existe el hecho que en la escritura Núm. 6 de segregación, agrupación y compraventa otorgada ante el Notario Martínez Dávila en San Juan, Puerto Rico, el 16 de enero de 1928, transacción que se repite por la escritura Núm. 12 de 15 de agosto de 1929 ante el Notario Edelmiro Martínez Rivera, la agrupación y la segregación que ahí se hacen de las porciones adjudicadas en 1922 a Rita de la Cruz Santiago (véase Plano, pág. 538), indebidamente incluyeron la Calle Rosario entre Labra y Figueroa. En esa forma el Municipio adquirió la propiedad agrupada y segregada por precio de $51,180.00.

A la luz de la prueba en el récord, a Rita de la Cruz no se le adjudicó título sobre la porción de esta calle, ni a ningún otro condómine, y fue ilegal incluirla en la agrupa-

ción y segregación y venta el Municipio. El propio Municipio al contestar la demanda en el pleito R-5777 alegó afirmativamente: ". . . siendo lo cierto que uno de los firmantes de la escritura número cuatro de 9 de enero de 1922 'Sobre División de Terrenos', otorgada por los demandantes, o sea, el Señor Luis de la Cruz y Santiago, casado con doña Rosa Figueroa Reyes, y quien concurrió en dicha escritura en concepto de apoderado de doña Rita de la Cruz y Santiago, por escritura número seis otorgada ante el Notario don José Martínez Dávila, el 16 de enero de 1928, vendió al extinto Municipio de San Juan, hoy Gobierno de la Capital, por la suma de $51,180.00 una parcela radicada en la Sección Sur del Barrio de Santurce del término municipal de San Juan; compuesta de 8,530 metros cuadrados, parcela que fue formada por dos parcelas segregadas y *fraudulentamente* agrupadas para que formaran una sola. Sigue alegando en contrario la demandada que en la venta a que se hace referencia el Municipio de San Juan, hoy Gobierno de la Capital, *se incorporó fraudulentamente el área que abarca la calle del Rosario* en un trozo comprendido entre las calles Figueroa y Labra, y que tiene un área total de 1,259.85 metros cuadrados". (Énfasis nuestro.) El Juez Cordovés Arana, en sus conclusiones de hecho determinó que esas fincas no podían ser agrupadas estando la Calle en el medio.

El Municipio hizo las anteriores expresiones en el año 1947. El récord no nos permite determinar, si en 16 de enero de 1928 y en 15 de agosto de 1929 cuando adquiere por escritura pública y por precio de $51,180.00 tenía o no conocimiento del "fraude", o si era o no un adquirente protegido por el Registro o si era o no un tercero civil.

En lo que a la calle respecta, y habiendo en la prueba un título escriturario a favor del Municipio sobre la porción de dicha calle, se dejará sin efecto la sentencia recurrida, y se devolverá el caso para que la Sala sentenciadora deter-

mine, a la luz de la prueba que las partes presenten, si al adquirir de Luis de la Cruz en 1928 y 1929 el Municipio era un tercero protegido por el Registro o si era un tercero civil de buena fe. De determinarse que era un tercero inocente, deberá sostenerse el título del Municipio sobre la porción de Calle. De lo contrario, a ésta le regirán igualmente los pronunciamientos hechos sobre la Plaza, al cesar el uso y dominio público.

Conforme a la estipulación de las partes de 10 de febrero de 1964, al devolverse el caso se determinará la cabida exacta de los predios en litigio, que deberán ser entregados materialmente a los demandantes, y se harán los pronunciamientos sobre frutos adeudados a partir del año 1957, la fecha en que cesó el uso y dominio público de los bienes envueltos. La Sala sentenciadora deberá fijar, además, los honorarios de abogado en primera instancia conforme a la súplica a tal efecto en la demanda.

*Se dictará sentencia de conformidad con todos los pronunciamientos anteriores.*

Los Jueces Asociados Señores Hernández Matos, Blanco Lugo, Rigau y Torres Rigual no intervinieron.